## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**KESMOND WILSON**

      Plaintiff(s),

                      CASE NO:

Vs

**FLORIDA'S NATURAL GROWERS**

      Defendant(s).

_____/

## ORIGINAL COMPLAINT

COMES NOW, the Plaintiff, KESMOND, by and through his undersigned attorney, and brings this action Florida's Natural Growers pursuant to the Civil Rights Act of 1866 (Equal Rights Under Law) and 42 U.S.C. § 1981.

### A. Jurisdictional Statement

1.      The U.S. District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2.      That the federal question involved in this case arises under 42 U.S.C. § 1981 ("Equal Rights Under Law").

3.      That the Plaintiff is a resident of Lake Wales, (Polk County), Florida.

4.      That the Defendant is a private corporation that is registered in the State of Florida Department of State, and having a principal office located at 20205 US-27, Lake Wales, Florida 33853.

5.      That the Defendant terminated the Plaintiff's employment under circumstances that give

rise to an inference of retaliation.

## STATEMENT OF FACTS

### Introduction

10.     Kesmond Wilson is an African American man. He is also an open member of the LGTB community. The Plaintiff, therefore, is also a member of the African American LGTB community. This lawsuit, however, is premised **solely, unequivocally,** and **completely** upon the Plaintiff's race (black/ African American), although some of the disturbing discriminatory incidents of discrimination alleged in this complaint were the result of the Plaintiff's sexual-orientation.

11.     The Defendant Florida's Natural Growers company website describes itself as follows:

> Florida's Natural Growers was organized in 1933 by a few growers with a passion for producing the best possible citrus products on Earth. Today, we are one of the largest cooperatives of citrus growers. We're hundreds of grower-owners strong. We own the land. We nurture the fruit. We harvest it at peak ripeness. Then we squeeze every delicious drop ourselves before bringing it to your table. That's how we can guarantee the quality of our juices.

### Quality Assurance Department

12.     The Defendant hired Mr. Wilson on February 18, 2019 for the position of Tech in the Quality Assurance (QA) Department.

        A.      Mr. Wilson's immediate supervisor was Rick Smith (white male).   His relationships with Mr. Smith was superb.

        B.      Mr. Wilson performed research on the Defendant's overall operations, enrolled in college courses through the Defendant's continuing education program, and expressed a desire to move up in the company.

        C.      As a Quality Assurance Tech, Mr. Wilson was responsible for analysis, pulling samples, monitoring production lines, and performing a variety of similar tasks and duties. He

received four very good performance evaluations while in the QA Department, as follows: (1).
30-day evaluation; (2) 60-day evaluation; (3) 90-day evaluation; and (4) 6-month evaluation.

13.     Unfortunately, Mr. Wilson experienced one incident of "discrimination," namely, a "badge
and (or) incident" of slavery which violates the 13th Amendment, U.S. Constitution and 42 U.S.C.
§ 1981, as follows:

A.      Some time in August 2019, Mr. Wilson was assigned to work along side a white/
Hispanic female named Lucy Abale, who also worked in the QA Department and was supervised
by Rick Smith.   They were approached by a man named white male named Damien Christopher,
and the conversation went as follows:

(1).    Damien Christopher to Lucy Abale: "Are you working hard today?"

(2).    Lucy Abale to Damien Christopher: "No, I am not, he's [Plaintiff Kesmon
Wilson] is my 'slave' today.

(3).    Kesmond Wilson to Lucy Abale: "I don't appreciate that comment. I am not
your slave."

(4).    Lucy Abale to Kesmon Wilson: "I apologize…."

14.     **First Protected Activity:**   In the QA Department, then, Mr. Wilson experienced what he
perceived to be his first incident of race discrimination, assuming that the word "slave" was used
to describe him because he was an African American.   Hence, Mr. Wilson complained to David
Barker in the Human Resources Department.   Mr. Wilson described the word "slave" as a mark of
discrimination against African Americans and, for this reason, determined that it was both
offensive and illegal to use. He therefore reported this incident as discriminatory treatment
because of "race" to Mr. Barker in the Human Resources Department.   Mr. Barker told Plaintiff

Wilson that he would look into the matter but he never got back to Plaintiff Wilson.

15.     With respect to averment # 14, Plaintiff Kesmond Wilson engaged in a protected action, pursuant to 42 U.S.C. § 1981, when he reported what he perceived to be "race" discrimination due to the "slave" comment by Lucy Abale.

### At-Home Sales Department

16.     In October 2019, Plaintiff Kesmond Wilson was transferred to the "At-Home Sales" Department, as per his own request and initiative as a result of his desire to move up on the company. His new position title was "Deduction Analyst/ Sales Assistant."

17.     His immediate supervisor was Aida Cassanova (Hispanic/ white female) and the next-level higher manager was Matthew Woodhall (white male). There was a "lead" person on Mr. Wilson's team: Yvette (Surname Unknown)(white female).

18.     Mr. Wilson was the only African American on his work team, as follows:

    A.  Aida Cassanova, Supervisor (white/ Hispanic female)

    B.  Yvette (Surname Unknown), Lead (white female)

    C.  Ariel (Surname Unknown)(white/ Hispanic female)

    D.  Marie (Surname Unknown)(white female)

    E.  Cindy (Surname Unknown)(white female)

    F.  Kesmond Wilson (black/ African American)

19.     First Week:   During the Plaintiff's first week in the At-Home Sales Department, he received very minimal orientation and training.   Yvette was assigned to orient and to train the Plaintiff.

20.     Second Week: During the Plaintiff's second week in the At-Home Sales Department, he

received very minimal orientation and training.   Yvette was assigned to orient and to train the Plaintiff.   On one day, Mr. Wilson forgot to clock in and out, and the discrepancy was discovered by Ms. Bonnie Hunter, a supervor in Sales/ Consumer Affairs.   An investigation was conducted, and the Human Resources Department determined that Mr. Wilson has "falsified a document" and that this action warranted a three-day suspension, beginning November 5, 6, and 7, 2019.

21.     Third Week:    Mr. Wilson served out a three-day suspension, after only being in the "At-Home Sales" Department for only two weeks.

        A.     Mr. Wilson returned to work in the At-Home Sales Department to what he perceived to be a "hostile working environment."

        B.     Supervisor Aida Cassonova sat down with Mr. Wilson to conduct his 30-day performance evaluation.

        C.     **Second Protected Activity**: Mr. Wilson informed Supervisor Cassanova, during this 30-day evaluation meeting, that: "I fear for my job," "I am concerned that as a big Black man.. any one of white females can accuse me of anything and that you all will believe them," and that "I am having communication issues with the white women in my department."   Mr. Wilson also raised concerns about being "the only African American" within the department, which seemed to reject him as regular member within the department.   During this said 30-day evaluation, Mr. Wilson thus couched his language in the form of an "equal opportunity" grievance on the basis of race: black/ African American.   However, Supervisor Aida Cassanova seemingly ignored Mr. Wilson's concerns and told him to "stay to yourself," "just do your job," and "don't talk to anybody."   Plaintiff Wilson did not find this recommendation to be satisfactory.

22.     In December 2019, Plaintiff Wilson and Supervisor Aida Cassanova conducted a 60-day

review, in which Mr. Wilson complained of general hostile working environment.   He particularly complained about one white female coworker who "mocked" his sexual orientation and showed him a picture of "talking condom," which Mr. Wilson found to be unprofessional and offensive.

23.      In January 2020, Plaintiff Wilson worked in hostile working environment: Jessica (Surname Unknown) snatched a piece of paper off of his desk; he got into a dispute with Yvette (Surname Unknown) about office procedures/ mail boxes, etc.   Mr. Wilson complained to Supervisor Aida Cassanova.

24.      In February 2020, Plaintiff Wilson mistakenly clocked in and out at the South Office, for which he was given a "write-up" on February 10, 2020.   On February 13, 2020, Mr. Wilson took a flight to Houston, Texas for a three-day vacation, during which time Aida Cassanova telephoned him to inform him that he was on suspension "until further notice."   Mr. Wilson was then placed on an unpaid leave.

25.      **Third Protected Activity:** Plaintiff Wilson confided in one of the few African American employees in the company: Ms. Charlene Norwood.   Ms. Norwood worked in the Accounting Department, and she was the only African American employee in that department. After Mr. Wilson was suspended, Human Resources Manager David Barker questioned Ms. Norwood about her prior communication to, and relationship with, Mr. Wilson. Ms. Norwood thus describes her communications with Mr. Barker as follows:

"Attorney Ford,

"On 2/18/2020 HR Supervisor David Barker sent me an email requesting an impromptu meeting.   The meeting was regarding an employee concern to be held at 2:30 pm.   I was not sure

what the matter was concerning, but I replied to let him know that I would be available.  He stated to me that he heard that Mr. Kesmond comes down to my office to vent; I abruptly interrupted him and told him that Mr. Kesmond doesn't come to my office to vent but he comes down there to seek solution. He asked me what Mr. Kesmond talks to me about and I told him certain things I would not be open to disclose, because he could be I client and I didn't feel comfortable disclosing our conversations.  He asked again about Mr. Kesmond venting to which I had to repeat it a few times that he came looking for solutions from a female point of view, but I felt as if he didn't believe me.

"After further questioning I was asked was Mr. Kesmond and I friends to which I explained to him that we had become acquaintances from Mr. Kesmond bringing check request down to my department for processing.  Through further questioning I was indirectly asked what would make Mr. Kesmond feel that I was qualified to assist him in seeking a solution, to which I let him know that I am a certified life coach and aiding people with conflict matters is what I do.

"So he asked me what could I tell him about the dialog he has shared with me about his experience with his coworkers and management.  **I told Mr. Barker at times it takes a person with a very strong skillset to be able to properly filter through certain personalities as well as cultural diversities; especially with him being a black male and his coworker being Caucasian females**.  I explained to Mr. Barker that we as females can sometime be extremely emotional and at times, we allow our emotions to cloud our judgment of others and ourselves. I also stated that the work environment is very hostile and that this company doesn't know how to properly and effectively deal with cultural diversity conflicts.

"**I also let Mr. Barker know that Mr. Kesmond shared with me that he has felt uncomfortable for a while being the only black male working in a department predominantly composed of white females, and how easy it is for things he may say to be misinterpreted.  He shared that he has tried to resolve many convicts with his fellow coworkers and once talking with them, things would appear to be ok for a while, but later would return to the norm, to which Mr. Kesmond found to be hostile.**  I notice while talking to Mr. Barker that he wasn't taking any written notes and I there forth felt like he really wasn't interested in what I was saying.  I expressed to him that my business that I operate when I get off of work at Florida's Natural is designed to provide individuals with tools to deal with conflict; however, all I can do is offer the tools.   It's solely up to the individual and God as to what they choose to do with them.

"When I got back to my desk Mr. Barker called me on the phone and asked me what was in the attachment that Kesmond sent me in Dec. 2019. I told him that it was an inspirational quote that I couldn't open up, so I told him to text me and then provided my phone number.   Mr. Barker seemed shocked to hear that Mr. Kesmond would send an inspirational quote, but I told him that sometimes he does that."

26.      Upon the conclusion of the investigation, the Defendant terminated Mr. Wilson on

February 20, 2020, [A] due to "harassing co-workers," all of whom were the very persons (white females) whom Plaintiff Wilson had forewarned Supervisor Aida Cassanova about, from the beginning of his employment in the At-Home Sales Department (See averment 21(C)). The Defendant also terminated Plaintiff Wilson   [B] due to a "306 offense," meaning that "proprietary business information" was mistakenly transmitted to his personal email.

### Count I.    DISPARATE TREATMENT (Race)
### (Plaintiff Met Reasonable Work Performance Expectations;
### Similarly-Situated White Employees Treated Less Harshly)

27.     The Plaintiff hereby restates and re-alleges paragraphs 1 through 26, as though those averments were stated verbatim within this count. This count is alleged pursuant to all of the parameters permitted under the pleading standards of Rules 8 and 11 of the Rules Regulating the Florida Bar, and the Rules Regulating the Florida Bar.

28.     The Defendant terminated the Plaintiff in violation of Section 1981 ("Race"), because of the Plaintiff's race (black/ African American).

29.     The Defendant treated similarly-situated white or non-black employees less harshly, under similar circumstances.

30.     At all times material to this action, Mr. Wilson was fully qualified to perform his job duties and that he did perform his job duties, as per the documentation of his work performance.

31.     Mr. Wilson received no forewarnings of prior "306 offenses" prior to his termination. He received no training, and he had no reasonable foreknowledge of "306 offenses" prior to being suspended and terminated.   As per the standards of Title VII of the 1964 Civil Rights Act (5th Circuit/ 11th Circuit), the Plaintiff also met his "reasonable work performance" expectations, based upon all of the training and prior discipline which he had received up to the date of his termination.

8

32.    The Defendant suspended and terminated Plaintiff Wilson under circumstances that give rise to racial discrimination: other white or non-black employees who have committed the same or similar infractions have not or ever been terminated for the a "306 offense" following a first offense.

33.    WHEREFORE, the Plaintiff demands:

    A.    Trial by Jury.

    B.    Judgment against the Defendants for compensatory and punitive damages.

    C.    Affirmative Action, as deemed appropriate by the Court.

    D.    Injunctive Relief, as deemed appropriate by the Court.

    E.    Attorney's fees and costs.

    F.    For whatever additional relief as is deemed just and appropriate by this honorable Court.

### Count II.    DISPARATE TREATMENT (Retaliation)
### (Plaintiff Complained Two Times Directly and One Time through Proxy of Racial Discrimination; Defendant Committed a Retaliatory Suspension/ Termination)

34.    The Plaintiff hereby restates and re-alleges paragraphs 1 through 26, as though those averments were stated verbatim within this count. This count is alleged pursuant to all of the parameters permitted under the pleading standards of Rules 8 and 11 of the Rules Regulating the Florida Bar, and the Rules Regulating the Florida Bar.

35.    Plaintiff Wilson engaged in protected activities on numerous occasions through complaining of racial discrimination to the employer's agents. See, e.g., averments 14, 21(c), and 25.

36.    The Defendant suspended Plaintiff Wilson on or about February 10, 2020 and terminated

him on or about February 20, 2020, and thus committed two adverse employment actions against him.

37.    The Defendant suspended and terminated Plaintiff Wilson because he had engaged in protected activities as mentioned in averments 14, 21(c), and 25.

38.    WHEREFORE, the Plaintiff demands:

      A.    Trial by Jury.

      B.    Judgment against the Defendants for compensatory and punitive damages.

      C.    Affirmative Action, as deemed appropriate by the Court.

      D.    Injunctive Relief, as deemed appropriate by the Court.

      E.    Attorney's fees and costs.

      F.    For whatever additional relief as is deemed just and appropriate by this honorable Court.

        **/s/ Roderick O. Ford**

        Roderick O. Ford
        FBN: 0072620
        The PMJA LEGAL DEFENSE FUND, INC.
        The Methodist Law Centre
        400 N. Ashley Drive
        Suite 1900
        Tampa, Florida 33602
        (813) 223-1200
        (813) 223-4226 facsmile
        admin@methodistlawcentre.com